IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LUMICO LIFE INSURANCE COMPANY,    *

    Plaintiff,    *

    v.    *    Civil Action No. 8:24-cv-01801-PX

ASHLEY NANCE,    *

    Defendant.    *

\*\*\*

**MEMORANDUM OPINION**

Pending in this declaratory judgment action are the parties' cross motions for summary judgment on whether Defendant Ashley Nance ("Nance") unlawfully procured from Plaintiff Lumico Life Insurance Company ("Lumico") a $250,000 whole-life insurance policy on her now deceased boyfriend, Guy Martin ("Martin"). ECF Nos. 38, 40, & 46. The motions are fully briefed, and no hearing is necessary. *See* D. Md. Loc. R. 105.6. For the following reasons, Lumico's motion is granted, and Nance's is denied.

**I.    Background**

Although this matter concerns a single life insurance policy that named Nance as the beneficiary upon her boyfriend's passing, Nance is no stranger to this process. Between 2015 and 2024, Nance has been named as the beneficiary, owner, or payor on *sixteen* different life insurance policies issued by twelve different insurance companies to insure five individuals, some of whom are unrelated or only loosely related to her. *See* ECF No. 40-3 at 89–96; *see also* ECF No. 40-3 at 11:6–22; *id.* at 12:22–13:21; *id.* at 23:10–24:20; *id.* at 25:1–18; *id.* at 26:6–27:4; *id.* at 35:4–36:6. The total face value of the benefits payable to Nance is roughly $6,540,000. *Id.* at 89–96. The policy applications and documents are littered with Nance's personal information, and most follow a similar pattern of securing the policy then changing the ownership to Nance. *See id.*

This case concerns only one such policy, Lumico # L0483213 (the "Policy" or "Lumico Policy"). ECF No. 1-2. The pertinent facts, summarized as follows, are undisputed unless otherwise indicated.

Nance first met Martin at a McDonalds some time in 2018 or 2019. ECF No. 40-3 at 40–41. Martin was homeless at the time and had been for about three years. ECF No. 40-4 at 446. Martin also had been addicted to drugs most of his adulthood and had been taking prescribed methadone for over 30 years. *Id.* He had hepatitis C and cancer. *Id.* His sole source of stated income was monthly social security payments of about $690. *Id*. at 155–56, 205, 252, 446.[1] In early 2021, Martin moved into subsidized housing with $100 to his name. *Id.* at 138–39.

In April 2021, Martin and Nance reconnected. ECF No. 40-3 at 43:4–45:3. They began dating, and in September 2021, Nance "moved in" with Martin, meaning she took her belongings to his apartment but still spent most nights at her own house. *Id.* at 51, 55–57. Although Nance testified that, by this point, she and Martin were romantically involved, elsewhere Nance characterizes Martin as her "client" for whom she provided professional caregiving services. ECF No. 40-4 at 76–77*; see also id.* at 82 (Martin's signed letter of recommendation for Nance as a "personal assistant"); *id.* at 447 (Martin' sister attesting that she did not know Nance as his girlfriend)*. But see* ECF No. 46-4 (Nance's mother describing how Nance and Martin "fell in love" despite substantial age difference).

On September 4 and 5, 2021, Nance helped Martin secure three whole life insurance policies, one of which was the Lumico Policy. ECF No. 40-3 at 59. No evidence suggests that Martin had insurance at the time. But according to Nance, Martin wanted to "buy insurance" for her "to help" her. *Id.* at 60. Nance also attests that Martin agreed to pay the initial monthly premium payments for the three policies, and that he gave her $7600 in cash toward those

---

[1] According to Nance, Martin also worked "side jobs" fixing cars. ECF No. 40-3 at 146:14–16.

payments over a several month period. *Id.* at 68–71. Bank records, however, show the roughly $900 monthly premiums for the Lumico Policy were always paid from Nance's bank account, which does not show any contemporaneous cash infusions. *Id.* at 122–159; *see also* ECF No. 40-4 at 297–424; *id.* at 447 (Martin's sister attesting that Martin had insufficient funds to pay any insurance premiums).

As for the contact information included on the Lumico application, it all pointed to Nance. Nance and Martin included Nance's home as the mailing address, and listed only her email address, phone number, and bank account information. ECF No. 40-5 at 5. Shortly after the policy was issued, Nance and Martin also emailed Lumico to make Nance the Policy owner, *id.* at 43, which eventually took effect on November 11, 2022, *id.* at 45–47.

Also on November 22, 2022, Nance, Martin, and Nance's mother, Joan Spence, purchased 1.4 acres of real property as joint tenants with rights of survivorship. ECF No. 46-1 at 1, 4. *See also* ECF No. 46-4 at 5–6. Martin died ten days later, on December 3rd. ECF No. 1 ¶ 36. On December 18, Nance filed her claim with Lumico for the $250,000 Policy benefits. ECF No. 40-4 at 71.

This suit followed. Lumico now asks this Court to declare that the Policy is void *ab initio* pursuant to Maryland Code Annotated, Insurance Article, section 12-201 which prohibits an individual from procuring life insurance on another unless the beneficiary possesses an "insurable interest" in the insured. ECF No. 1 ¶ 46–62. Discovery closed on July 7, 2025. ECF Nos. 26, 28. After several jointly requested extensions, the parties filed their dispositive motions which are now ripe and ready for resolution,[2] with no hearing necessary. L.R.

---

[2] On April 1, 2026, nine months after the close of discovery, and five months after the parties completed summary judgment briefing, Nance moved to reopen discovery so that the Court may consider the opinions of economist Thomas Borzilleri on whether Nance retained an insurable interest in Martin. ECF Nos. 57 & 57-2. As grounds, Nance singularly argues that her newly retained counsel wishes to fix the mistakes of his predecessor. ECF No. 57-1 at 4. Alternatively, Nance asks the Court to take judicial notice of the expert's opinion. *Id.* at 5. The Court denies the request because Nance has not demonstrated sufficient good cause to reopen discovery. The good cause showing principally turns on whether the movant can demonstrate she could not meet discovery deadlines despite exercising reasonable diligence. *Drasovean v. Eaton Corp.*, Civ No. DKC 11-1288, 2012 WL 5409737, at *1 (D. Md. Nov. 5, 2012) (citations omitted). Nance has made no such showing. Her claimed dissatisfaction with her

3

105.6(a).  For the following reasons, Lumico's motion is GRANTED and Ashley's motion is DENIED.

## II.        Standard of Review

A court may grant summary judgment when, viewing the evidence in the light most favorable to the non-moving party, there exists no genuine disputed issue of material fact, entitling the movant to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)).  "A mere scintilla of proof . . . will not suffice to prevent summary judgment."  *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003).  Importantly, "a court should not grant summary judgment 'unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances.'"  *Campbell v. Hewitt, Coleman & Assocs., Inc.*, 21 F.3d 52, 55 (4th Cir. 1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Casualty & Sur. Co.*, 381 F.2d 245, 249 (4th Cir. 1967)).  On cross motions for summary judgment, a court must "'evaluate each party's motion on its own merits, taking care [in each instance] to draw all reasonable inferences against the party whose motion is under consideration.'"  *Snyder ex rel. Snyder v. Montgomery Cty. Pub. Sch.*, No. DKC 2008-1757,

---

counsel aside, Nance had ample opportunity to secure experts, and yet, chose to do nothing for months.  Rather, she only sought new counsel after she *lost* the near identical action involving one of the other life insurance policies she procured for Martin.  *See CMFG Life Insurance v. Nance*, 819 F. Supp. 3d 420 (D. Md. 2026) (opinion published January 7, 2026).  Nor can Nance overcome the substantial prejudice that reopening discovery would visit on Lumico if forced to rebut the expert's conclusions well after the close of discovery.  For these reasons, the motion to reopen discovery, ECF No. 57, is denied.  Nor will the Court take "judicial notice" of an array of facts not otherwise in the record and subject to substantial challenge.  ECF No. 57-1 at 5–8; ECF No. 60-1 at 8–10.

2009 WL 3246579, at *5 (D. Md. Sept. 29, 2009) (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

### III.    Analysis

Maryland prohibits one person from "wagering on the life of another" through the purchase of life insurance where the person does not possess an "insurable interest" in the insured. *Hopkins v. Hopkins*, 328 Md. 263, 268 (1992). Like many states, Maryland has long codified this prohibition. *See id.; see also Beard v. Am. Agency Life Ins. Co.*, 314 Md. 235, 244–45 (1988). In its current form, section 12-201(a)(2) of the Maryland Code Annotated Insurance Article provides that "a person may not procure or cause to be procured an insurance contract on the life or body of another individual unless the benefits under the insurance contract are payable to [either] . . . (i) the individual insured; (ii) the individual insured's personal representative; or (iii) a person with an insurable interest in the individual insured at the time the insurance contract was made." Md. Code. Ann. Ins. § 12-201(a)(2).

As neither the insured nor a personal representative, Nance may lawfully remain the beneficiary of the Policy only if she did not "procure or cause to be procured" the Policy, or if she maintained an "insurable interest" in Martin's life at the time the Policy issued. *Id.* Section 12-201(a)(3) defines "insurable interest" as "a lawful and substantial *economic* interest in the continuation of the life, health, or bodily safety of the individual" for those not related to the insured by blood, marriage or adoption. *Id.* § 12-201(a)(3) (emphasis added). However, where a person's interest is more "enhanced in value by the death, disablement or injury of the [insured]" than his life, that person does not possess an "insurable interest." *Id.* A policy procured in violation of Section 12-201 is *void ab initio*. *CMFG v. Nance*, 819 F. Supp. 3d 420, 426 (D. Md. 2026) (relying on *Beard*, 314 Md. at 240).

Lumico contends that the record viewed most favorably to Nance shows she "procured or caused to be procured" the Policy, and at a time where she maintained no insurable interest

in Martin. ECF No. 40-2 at 17–34. Nance, in response, insists that Martin alone procured the Policy, and as Martin's domestic partner, she maintained the requisite economic interest in his continued life because they cohabitated, co-owned property, and made medical decisions for his benefit together. ECF No. 46 at 9–11. When viewing the record evidence most favorably to Nance, Lumico prevails.

First, with respect to procurement of the Policy, notably Section 12-201 reaches an individual who either "procures" or "causes to be procured" the life insurance policy. Md. Code. Ann. Ins. § 12-201(a)(2). "[A] beneficiary who is closely involved in the insurance application process can be subject to the insurable interest requirement under the 'cause to be procured' clause." *CMFG*, 819 F. Supp. 3d at 427. Nance for her part, denies that she procured the Policy because Martin "signed and submitted the application, was named as policyowner, and provided funds to cover the initial premium." ECF No. 46 at 6. Even taking those facts as true, they do not generate a material dispute on whether Nance *caused* the Policy to be procured. *See CMFG*, 819 F. Supp. 3d at 428.

Before Nance met Martin, he had no assets whatsoever and no demonstrated ability to obtain life insurance. ECF No. 40-4 at 447. His health was poor, and he was living in subsidized housing—getting by on $690 a month from social security. *Id.* at 138–39, 155–56, 446. But in the span of 48 hours, just days after Nance moved in, Nance facilitated submission of *three* whole-life insurance applications in Martin's name. ECF No. 40-3 at 59. According to Nance, she and Martin together researched the insurance policies, she filled out the applications on her laptop, and they decided that Nance would help "manage" the Policy. *Id.* at 64, 67. Although Nance attests that Martin gave her $7,600 in cash to cover ten premium payments total for the three policies, bank records reflect that Nance paid the Lumico Policy premiums from her own bank account without a corresponding cash infusion identified as coming from Martin. *Id.* at 123–171. Also, the Policy included Nance's mailing address, her

telephone number, and her email address as the sole points of contact.  ECF No. 40-5 at 5. Nance plainly was the driver behind the procurement of the Policy.  Thus, even considering Martin's cooperation, no reasonable juror could conclude that Nance did not at least *cause* the Policy to be procured.  *See CMFG*, 819 F. Supp. 3d at 428.

Next, given that Nance "caused to be procured" the Policy, she is entitled to the Policy benefits only if she had an "insurable interest" in Martin, or "a substantial economic interest in the continuation of [Martin's] life, health, or bodily safety," at the time the Policy was procured. Md. Code Ann. Ins. Art. § 12-201(a)(3).   Nance can only make this showing with evidence that, at the time the Policy was procured, she would "reasonably expect to be better off financially" if Martin's life continues, and "worse off if it ends."  *CMFG,* 819 F. Supp. 3d at 428 (quoting *Crum v. Jackson Nat'l Life Ins. Co.*, 880 S.E.2d 205, 209 (Ga. 2022)); *see also Beard,* 314 Md. at 246 (beneficiary must show she would be "better off from the standpoint of money" if the insured lived).

When viewing the record most favorably to Nance, no evidence shows that *at the time* she caused the Policy to be procured, she would have benefitted more financially from Martin's life than his death.  As of September 2021, Martin made $698 a month from social security. ECF No. 40-4 at 284–86.  According to his rental application, he owned no other assets and had very little in his sole bank account.  *See id.* at 125–140, 147–49, 152.  He paid for almost nothing for Nance as of September 1, with Nance choosing to stay at her own home most nights.  ECF No. 40-3 at 54 (Nance not moving her "things" into Martin's apartment until September 1, 2021); *id.* at 56:22–57:2 ("I stayed approximately 10 nights in September 2021 at Guy's apartment").   From this, no reasonable juror could conclude that Nance would financially benefit from Martin's continued health and safety sufficient to constitute an "insurable interest."  *See CMFG*, 819 F. Supp. 3d at 430.

Nance in response, points only to events that, by law, have no bearing on the insurable interest question. She highlights that at the time of Martin's death, the couple owned property together. ECF No. 46 at 9. But the deed to the property reflects a purchase made in November of 2022, some fourteen months *after* the Policy issued. ECF No. 46-1.[3] Nor does Nance's role as "decision maker" on Martin's medical directive, which was not executed until May 26, 2022, make a difference. ECF No. 46-2 at 1. Martin's faith in Nance's judgment at that juncture does not illuminate her pecuniary interests in his continued life some seven months before. Last, their continuous cohabitation is largely irrelevant considering that, at the time the Policy took effect, the couple had been living together only a matter of days, with Nance spending more nights at her own home than his, and with Martin offering little to no financial support. *Compare* ECF No. 40-5 at 18 (showing Policy issuance on September 4, 2021) *with* ECF No. 40-3 at 48-57 (Nance testifying that she began living with Martin on September 1, 2021). Accordingly, no reasonable juror could conclude that Martin had been worth more to Nance alive than dead at the time the Policy was issued. For these reasons, the Court must grant summary judgment in Lumico's favor and deny Nance's motion.

IV.    **Conclusion**

As a matter of law, Ashley Nance had no insurable interest in the insured, Guy Martin, at the time she caused the Lumico Policy to be procured. The Court, therefore, grants summary judgment in favor of Lumico Life Insurance Company (ECF No. 38), and declares the Policy void *ab initio*. Lumico retains no past, present, or future obligation to pay the Policy benefits to Nance. Likewise, because the Policy is void, Lumico must return all premiums paid from Nance's account to Nance, thereby restoring the parties to their original positions as if the

---

[3] Additionally, as Judge Abelson correctly noted in *CMFG*, even if the Court considered that Martin's supposed contribution to the mortgage payments ended when he died, "that would still not be sufficient for a substantial economic interest" because Nance's equity would have "increased by the same proportion" upon his death because they held the property as joint tenants with rights of survivorship. *See CMFG,* 819 F. Supp. 3d at 430 (citation omitted).

Policy had not been issued.  The Court also denies Plaintiff Ashley Nance's cross motion for summary judgment (ECF No. 46); denies as moot Lumico's Motion to Strike or in the Alternative for Leave to File a Surreply (ECF No. 49); denies Nance's Motion for Extension of Time to Complete to Reopen Discovery (ECF No. 57); and grants the motions to seal at ECF Nos. 39 & 59.

A separate Order follows.

Date:   July 8, 2026

/s/
_____
PAULA XINIS
United States District Judge